ATTORNEY GENERAL OF the UNITED STATES of America, Appellant,

v.

The IRISH PEOPLE, INC., Appellee.

No. 81–1035.

United States Court of Appeals, District of Columbia Circuit.

Argued 21 Oct. 1981.

Decided 2 July 1982.

Brian K. Ahearn, Atty., Dept. of Justice, Washington, D. C., with whom John C. Keeney, Acting Asst. Atty. Gen., John L. Martin and Joseph E. Clarkson, Attys., Dept. of Justice, Washington, D. C., were on the brief for appellant.

Charles S. Sims, New York City, with whom Helene M. Freeman, New York City, and Mark Lynch, Washington, D. C., were on the brief for appellee.

Before BAZELON, Senior Circuit Judge, and WILKEY and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

Separate opinion for the Court filed by Circuit Judge WALD.

Concurring opinion filed by Senior Circuit Judge BAZELON.

PER CURIAM:

Judge Wilkey files an opinion in which Judge Wald and Senior Judge Bazelon concur, except with respect to Part II, A (entitled "Lack of Improper Motivation"). Judge Wald files a separate opinion in which Senior Judge Bazelon concurs. Judge Wald's opinion, and Judge Wilkey's opinion, except for Part II, A, together constitute the opinion of the court. The district court's order is reversed and the case remanded for further proceedings consistent with the opinion of the court.

*So Ordered.*

WILKEY, Circuit Judge:

The Attorney General of the United States, plaintiff/appellant, initiated this suit under the Foreign Agents Registration

Act[1] ("FARA" or "the Act") to compel defendant/appellee, publisher of the newspaper *The Irish People*, to register under the Act. The district court ruled that certain documents requested by the defense from plaintiff were state secrets, as the Attorney General claimed, but that defendant had established a need for discovery of the documents in order to pursue the selective prosecution defense it had raised. The court therefore concluded that since the Attorney General chose not to surrender the material to the defendant the action had to be dismissed.

We reverse because we find that neither element necessary for a selective prosecution defense was sufficiently demonstrated by the district court's opinion, 502 F.Supp. 63, for the defendant to be entitled to discovery on the issue. We also caution that on remand, even if a colorable selective prosecution claim is ultimately demonstrated to exist, outright dismissal may be too extreme a measure to invoke for plaintiff's inability to comply with defendant's discovery request.

## I. BACKGROUND

On 16 August 1976 the Attorney General filed this complaint seeking a mandatory injunction requiring defendant, a New York corporation and publisher of the weekly newspaper *The Irish People*, to register with his office as required by FARA. The Act requires that, with certain exceptions, anyone acting as an agent of a foreign principal register with and make certain disclosures to the Attorney General. The main allegations of the suit are that the defendant is controlled and partially financed by the Irish Northern Aid Committee (INAC), an admitted agent of a foreign principal, and that the defendant in turn is

a means to garner support for INAC and its principal, the Irish Republican Army (IRA).[2] The defendant has denied these allegations and has raised a series of affirmative defenses including selective prosecution. Specifically, the defendant claims that it was improperly singled out for registration under FARA, not as a matter of legitimate discretion, but rather "because of hostility to the editorial policy of defendant, and the [Irish Republican] cause it espouses,"[3] and as a result of pressure from the British and perhaps the Irish governments.

Beginning in January 1978 *The Irish People* engaged in extensive efforts to secure production and discovery of information and documents it claimed to be relevant to its factual exculpation and legal defenses. Eventually, after various interim orders and extensive briefing by the parties, the parties joined issue over the documents which the Attorney General sought to shield from discovery as state secrets. In the meantime the Attorney General had furnished a large number of other documents.

By a memorandum opinion of 13 July 1979[4] the district court held that the state secrets privilege did apply, and denied defendant access to the privileged material.

On the basis of this denial, the defendant next moved for the dismissal of the Attorney General's cause of action, asserting that without access to the privileged material the defendant could not adequately pursue its defense of selective prosecution and that the Attorney General, by successfully invoking the privilege, was now precluded from seeking a mandatory injunction requiring defendant to comply with FARA. Defendant argued that "fair adjudication ... has been rendered impossible by the

1. 22 U.S.C. §§ 611–621 (1976). The specific provision under which this action is brought is *id.* § 618(f).

2. In its FARA registration INAC has identified its foreign principal as the "Northern Aid Committee." However, in a case decided by the United States District Court for the Southern District of New York, *Attorney Gen. v. INAC*, 530 F.Supp. 241 (S.D.N.Y.1981), and affirmed by the Second Circuit, 668 F.2d 159 (2d Cir.

1982), it was held that the true foreign principal of INAC is the Irish Republican Army, an organization generally characterized as terrorist.

3. Defendant's Answer, Joint Appendix (J.A.) at 6–7.

4. Docket No. 76–1518, J.A. at 47.

government's assertion of a claim of state secrets privilege to withhold relevant evidence necessary for the defense."[5]

After considering the arguments of the parties, the district court found that the defendant had established a need for the privileged material in order to pursue the selective prosecution defense and that the plaintiff had to surrender the material to the defendant or the action would be dismissed.[6] The plaintiff moved for reconsideration, arguing that neither the circumstances nor the applicable law warranted such a dismissal. The district court denied the motion for reconsideration and granted defendant's motion to dismiss.[7]

5. Defendant's Motion to Dismiss, J.A. at 55.

6. Memorandum opinion (mem. op.), No. 76–1518 (D.D.C. 8 Aug. 1980), J.A. at 112.

7. Order, No. 76–1518 (D.D.C. 6 Nov. 1980), J.A. at 136.

8. Because we conclude that the findings of the district court demonstrate not even a *colorable showing* of selective prosecution, reversal is proper whether or not the showing which a defendant must make to obtain discovery differs from the showing it must make at trial to establish a *prima facie case* of selective prosecution. *See United States v. Diggs*, 613 F.2d 988, 1003 n.87 (D.C.Cir.1979), *cert. denied*, 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 838 (1980). However, because this determination will likely confront the district court on remand if it continues its inquiry into whether there has been a sufficient showing by defendant, we find further at this time that defendant in fact need make only a colorable showing of each prong of the defense in order to be entitled to discovery. This or something like it seems to be the rule in most other circuits which have reached this issue. *See United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974) ("'colorable basis'"); *United States v. Berrigan*, 482 F.2d 171, 177 (3d Cir. 1973) ("colorable basis"); *United States v. Falk*, 479 F.2d 616, 620–21 (7th Cir. 1973) (en banc) ("facts sufficient to raise a reasonable doubt about the prosecutor's purpose"). *But see United States v. Johnson*, 577 F.2d 1304, 1309 (5th Cir. 1978) (prima facie showing required for discovery). Note that this entitlement does not necessarily mean that dismissal is proper should compliance with discovery be impossible. *See pp. 949–955 ("III. The Improper Dismissal Issue") infra.* We need not reach the question of to what extent the selective prosecution defense may be inappropriate in a civil suit context, though we

We reverse. The opinion by the district court adequately demonstrated neither of the two elements necessary for a selective prosecution—*improper motivation* and *selection* by the Government.[8] Moreover, in any event outright dismissal may have been too extreme a measure for the district court to invoke. We discuss these two findings in turn.[9]

## II. The Selective Prosecution Claim

■ As we held in *United States v. Diggs*,[10] a defendant alleging or invoking the selective prosecution defense, even at the discovery stage, must offer at least a colorable claim *both* that the prosecution was improperly motivated *and* that it was selective in the first place.[11] In the case at

do hold that when the interests of the parties in the suit must be balanced, the civil or criminal nature of the case is important. *See* note 25 and pp. 949–955 ("The Improper Dismissal Issue") *infra*.

9. Defendant also challenges the district court's 4 January 1977 order denying its motion to dismiss for lack of jurisdiction. However, we agree with the district court that sufficient contacts exist for jurisdiction to be proper here. *See Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *McGee v. International Life Ins. Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

10. 613 F.2d 988, 1003–04 (D.C.Cir.1979), *cert. denied*, 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 838 (1980).

11. Other cases supporting this two-part approach are discussed at pp. 946–949 ("II.B *Lack of Selection*") *infra*. We also note that this analysis was employed by Judge Haight in proceedings related to this one. *Attorney Gen. v. INAC*, 530 F.Supp. 241 (S.D.N.Y.1981), *aff'd*, 668 F.2d 159 (2d Cir. 1982). INAC—the alleged principal in our case—invoked a selective prosecution defense when the Attorney General sought to compel it to register under FARA as an agent of the IRA. Judge Haight held:

Selectivity alone does not render prosecution unlawful, *Oyler v. Boles*, 368 U.S. 448, 455–56 [82 S.Ct. 501, 505, 7 L.Ed.2d 446] (1962); *Moss v. Hornig*, 314 F.2d 89 (2d Cir. 1963); rather, to be unlawful, the decision to prosecute must be predicated on some unjustifiable standard. *Oyler, supra*, 368 U.S. at 456 [82 S.Ct. at 505]; *Yick Wo v. Hopkins*, 118 U.S. 356 [6 S.Ct. 1064, 30 L.Ed. 220] (1886); *United States v. Steele*, 461 F.2d

hand, however, the district court's opinion does not indicate that defendant has done either.

## A. Lack of Improper Motivation

### 1. Overview

The district court found, first, that defendant had established "entitlement to discovery relating to the defense of selective prosecution" and, second, that "the particular documents that the defendant seeks to discover are sufficiently related to that defense to justify compelling the government to release them." [12]

All three judges on this panel are agreed that the district court must reconsider both findings. We are agreed that the evidence cited by the district court did not entitle defendant to discovery since it did not demonstrate a colorable showing of improper motivation, and that—even if such a showing were made—the documents in question may not be sufficiently relevant to the defense to justify their discovery.[13]

The district court listed the reasons for its conclusion that the defendant had established entitlement to discovery on the selective prosecution issue as follows:

[T]he court is satisfied that regardless of the test applied—reasonable doubt, colorable basis, beyond frivolous, evidence tending to show essential elements—the defendant has carried his burden. Particularly significant is the January 30, 1980 deposition of Mr. Dennis Dickson, a former F.B.I. Legal Attache stationed with the American Embassy in London. Dickson indicated that the United States Department was at one time "getting various requests from the Government of Ireland as to what the U.S. was doing to prosecute individuals that were shipping guns, ammunition, that was in violation of the Registration Act. . . ." Dickson Deposition at 50. He confirmed that at a meeting convened by the State Department, *id.*, apparently on September 26, 1973, *id.* at 47, there was discussion of means of alleviating *political* as well as financial and military support furnished by [sic] Irish militants by U.S. citizens, *id.* at 52–53. In view of these and other statements in the Dennis Deposition, it would be unreasonable to deny the requested discovery.[14]

The district court then turned to whether the documents defendant sought, which the court had earlier ruled to be state secrets, would bear on whether the Attorney General was improperly motivated. The court quoted *United States v. Reynolds*[15] in concluding that dismissal would be proper if the Government had "invoke[d] its governmental privileges to deprive the accused of anything which *might be material* to his defense."[16]

Having examined each of the documents in camera, Judge Flannery then concluded:

There is a manifest likelihood that documents reflecting communications be-

---

[12]. Mem. op. at 5, J.A. at 116.

[13]. *See* Opinion of Wald, J.

[14]. Mem. op. at 4, J.A. at 115 (emphasis in original).

[15]. 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953).

[16]. *Id.* at 12, 73 S.Ct. at 534 (emphasis added by the district court).

1148, 1151 (9th Cir. 1972) (prosecution unlawful if it is an act of discrimination against those who exercise their First Amendment rights). The party raising the defense of selective prosecution "bears the heavy burden of establishing, at least *prima facie*, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights." *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974). If the defendant establishes a *prima facie* case, the burden shifts to the government to prove that the prosecution did not arise from discriminatory motives. *Id.* at 1212 n.4 and cases cited therein.
*Id.* mem. op. and order at 19.
Judge Haight ultimately ruled in favor of the Attorney General on all issues, including the selective prosecution defense.

tween agencies of the Irish and British governments and agencies of the United States would shed considerable light on the existence *vel non* of at least one unlawful basis for the present prosecution. Indeed, as this court stated earlier in this case, "The defendant in the case *sub judice* has argued persuasively that proof of the existence of communications between agencies of the British or Irish governments and American agencies is crucial to its defense of selective prosecution. . . ." [17]

The district court apparently concluded that something which "might be material" to defendant's defense had been shown *if* the documents demonstrated that "the British or Irish governments had communications or discussions with American agencies, or officers, which might have resulted in, stimulated, or led to the intensification of the investigation by American agencies" [18] of *The Irish People.*

However, it is clear that Congress intended to allow the Attorney General to be motivated in part by foreign policy, international political, and national security considerations, as is discussed at length below.[19] A showing that the Attorney General acted in such a way is not a showing of improper motive at all. Thus, the district court erred if it ruled that defendant was entitled to discovery because the Attorney General may have sought defendant's registration at the request of our allies.[20] It similarly erred if it held that the documents in question here were relevant to the defense since

17. Mem. op. at 6, J.A. at 117.

18. *Id.* at 5, J.A. at 116 (quoting from Second Reply Statement of Points and Authorities in Support of Defendant's Motion to Compel, at 9).

19. *See* "2. *The meaning of FARA,*" pp. 937–945 *infra.*

20. *See* mem. op. at 4, J.A. at 115 ("[Deponent] indicated that the United States [State] Department was at one time 'getting various requests from the Government of Ireland as to what the U. S. was doing to prosecute individuals that were shipping guns, ammunition, that was in violation of the Registration Act. . . .' . . . In view of these and other statements . . . it would be unreasonable to deny the requested discovery").

Judge Wald's opinion, while finding that the district court erred in finding a colorable showing of improper motivation since the evidence relied on was too scant, holds open the possibility that a showing of intent by the Attorney General to "alleviat[e] *political* as well as financial and military support furnished by [sic] Irish militants by U. S. citizens," mem. op. at 4, J.A. at 115 (emphasis in original), *would* suffice to show improper motivation.

I disagree, but I should first note the limited scope of our disagreement. We agree that—even under the standard the majority would use—there has been no colorable showing discernible from the district court's opinion here. I am not convinced that the district court *was* using the standard the majority would use—it found "relevant" evidence which in no way demonstrated a desire to alleviate political support—but this disagreement is itself of limited relevance since we are reversing on this issue anyway.

This said, I turn to my disagreement with the majority's position that a desire on the part of the Attorney General to diminish political support for registrants on one side of a political debate is improper. Motive can be improper in two ways: it can have no rational basis under the statutory scheme being enforced, or it can in and of itself be violative of the Constitution. *See* p. 935 *infra.* I think that the discussion of *"The meaning of FARA,"* pp. 937–945 *infra,* demonstrates that Congress was more concerned with the registration of agents inimical to American interests than those not, and the whole purpose of the Act is to "alleviat[e] *political* . . . support" for registrants, especially unfriendly ones, by showing for whom they are working. It follows that there would be no *statutorily* improper motive here.

As for *constitutionally* improper motive, I can again only refer to what I say later: that the purpose of the Act is to require registration and disclosure from foreign agents, that this disclosure is required because it will "undermine" the speaker's credibility, and that the courts have consistently held this requirement to be constitutional. *See* pp. 935–936 *infra.*

> [T]he bill is intended to label information of foreign origin so that hearers and readers may not be deceived by the belief that the information comes from a disinterested source. Such legislation implements rather than detracts from the prized freedoms guaranteed by the First Amendment. No strained interpretation should frustrate its essential purpose.

*Viereck v. United States,* 318 U.S. 236, 251, 63 S.Ct. 561, 568, 87 L.Ed. 734 (1943) (Black, J., dissenting on other grounds). True, what is involved here is not the constitutionality of the statute on its face, but its constitutionality as allegedly applied. But I think that the same

*they* might demonstrate that our allies' wishes influenced the Attorney General.[21]

There is some confusion in the case law—and the district court's opinion—over what constitutes "improper motivation." Two kinds of motives are apparently impermissible: those which have no rational basis under the statutory scheme being enforced, and those which are in and of themselves violative of the Constitution.[22]

The analysis of the meaning of FARA in the next section specifically addresses the first objection. It demonstrates that consideration of an ally's wishes and the defendant's alleged foreign ties and unfriendly activities *is* rational under the statutory scheme of the Act.

The centrality of these considerations to FARA also dictates the rejection of any allegation that the registration sought here is improperly motivated as a matter of constitutional law. In the first place, given the conclusion that FARA's origin, language, and application show it to be aimed at agents who are "propagandists" for principals like the IRA, defendant's First Amendment and equal protection constitutional challenges to FARA as applied in this case cannot be separated from a challenge to the general constitutionality of the Act. Yet it is well settled that FARA is constitutional.[23] Moreover, the cases upholding its constitutionality generally involved agents

---

factors that make the statute itself constitutional also make the Attorney General's application of it here constitutional: the Government's interest is great, the infringement on the registrant attenuated and minor. *See* note 25 *infra.* The Act itself may skew domestic "debates over foreign policy," as the majority says at pp. 956–957, *infra,* since foreign agents generally may be more inclined to adopt one set of views than another, so again it will not do to say that it is only the Attorney General's uneven application of the Act that runs afoul of the Constitution. I see no way to conclude that FARA is constitutional and the Attorney General's application of it in the situation hypothesized unconstitutional. So long as the registration and "alleviation of political support" (i.e., disclosure) are sought for considerations consistent with the statute—for foreign policy, international political, and national security reasons—I do not think there is motive violative of the First Amendment. (Note, therefore, that a showing that FARA was being used solely, say, to undermine views which might keep the Administration from being reelected *would* suffice.) The majority concedes that the Attorney General may "target those alleged agents deemed most dangerous or powerful (i.e., saboteurs, terrorists)," while denying that this targeting may be done "to manage the information put before the American people in debates over foreign policy." Opinion of Wald, J. at pp. 1–2. But the danger and power of an agent is definable only in political terms, and the whole point of the Act is "to manage the information put before the American people in debates on foreign policy."

I fear finally that, because the Attorney General's motives for bringing suit under FARA will invariably involve political considerations, the majority's formulation will make the selective prosecution defense, and the discovery of the sensitive documents also invariably in-

volved, too common. Yet the selective prosecution defense has hitherto been rarely invoked and is even more rarely successful, further evidence that the concurrence's formulation is an incorrect one.

**21.** *See* mem. op. at 6, J.A. at 117.

**22.** *See, e.g.,* cases cited at note 104 *infra. See also Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 505, 7 L.Ed.2d 446 (1962); *People v. Mantel,* 88 Misc.2d 439, 388 N.Y.S.2d 565, 568 (Crim.Ct.1976).

**23.** The power the Attorney General has under FARA to require registration partly or entirely on the basis of foreign policy, international political, and national security considerations inevitably raises equal protection and First Amendment issues. However, it seems pointless to deal at length with these issues here since FARA's constitutionality is well-settled. It has been on the books for over 40 years, and cases involving it have been before the federal courts at every level—including the Supreme Court—without there ever being a holding of unconstitutionality. On several occasions, constitutional challenges at best indistinguishable—and probably much stronger—than those defendant could raise here have been explicitly rebuffed. *See Attorney Gen. v. INAC,* 530 F.Supp. 241 at 253 (S.D.N.Y.1981), *aff'd,* 668 F.2d 159 (2d Cir. 1982) (citing *Viereck v. United States,* 318 U.S. 236, 251, 63 S.Ct. 561, 568, 87 L.Ed. 734 (1943) (Black, J., dissenting)); *Attorney Gen. v. INAC,* 346 F.Supp. 1384, 1390–91 (S.D.N.Y.), *aff'd mem.,* 465 F.2d 1405 (2d Cir.), *cert. denied,* 409 U.S. 1080, 93 S.Ct. 679, 34 L.Ed.2d 669 (1972) (citing *Uphaus v. Wyman,* 360 U.S. 72, 79 S.Ct. 1040, 3 L.Ed.2d 1090 (1959); *Barenblatt v. United States,* 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959); *Wil-*

with specific constitutional claims at least as colorable as defendant's here.[24] Finally, there is certainly no reason to disturb these precedents on the basis of the facts before us today. All that is sought here is registration and disclosure. No limit is to be placed on what defendant can say, or whom he can see.[25]

> kinson v. United States, 365 U.S. 399, 81 S.Ct. 567, 5 L.Ed.2d 633 (1961); Communist Party of the U. S. v. Subversive Activities Control Bd., 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1960); Albertson v. Subversive Activities Control Bd., 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965)); United States v. Peace Information Center, 97 F.Supp. 255, 260 (D.D.C.1951) ("The power over external relations of the United States is extensive. It authorizes the Federal Government to deal with all phases of this subject. It comprizes [sic] not only authority to regulate relations with foreign countries, but also to prohibit any disturbance or interference with external affairs"). See also Viereck v. United States, 318 U.S. 236, 251, 63 S.Ct. 561, 568, 87 L.Ed. 734 (1943):
>
>> As the House and Senate Committees considering the [FARA] Bill said, it "does not in any way impair the right of freedom of speech, or free press, or other constitutional rights." Resting on the fundamental constitutional principle that our people, adequately informed, may be trusted to distinguish between the true and the false, the bill is intended to label information of foreign origin so that hearers and readers may not be deceived by the belief that the information comes from a disinterested source. Such legislation implements rather than detracts from the prized freedoms guaranteed by the First Amendment. No strained interpretation should frustrate its essential purpose.
>
> (Black, J., dissenting); Narenji v. Civiletti, 617 F.2d 745 (D.C.Cir.1979), cert. denied, 446 U.S. 957, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980) (discussed at note 25 infra); United States v. Elliott, 266 F.Supp. 318 (S.D.N.Y.1967).

**24.** See preceding note.

**25.** Thus, to the extent the balance struck here between The Irish People's claims and governmental necessity must be scrutinized, the Attorney General has acted permissibly. As was noted in the related proceedings in the Second Circuit:

> No such showing ["that disclosure would expose ... members to economic reprisal, loss of employment, physical coercion, etc., and that the disclosure would have little or no bearing on the information the state was attempting to obtain"] appears here. Unlike NAACP [v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)], there is a strong governmental interest supporting the disclosure sought and, in such cases, the [Supreme] Court has required production. See Uphaus v. Wyman, 360 U.S. 72 [79 S.Ct. 1040, 3 L.Ed.2d 1090] ... (1959); Barenblatt v. United States, 360 U.S. 190 [79 S.Ct. 1081, 3 L.Ed.2d 1115] ... (1959). This is a case in which a balance between individual and governmental interests must be struck as in all cases when First Amendment rights are asserted to bar governmental interrogations. Barenblatt, supra. Here the balance tilts strongly in favor of the Government.
>
> The purpose of the Act is to protect the interests of the United States by requiring complete public disclosure by persons acting for or in the interests of foreign principals where their activities are political in nature. ...
>
> The Act is founded upon the indisputable power of the Government to conduct its foreign relations and to provide for the national defense and so falls within the inherent regulatory power of Congress. ...
>
> . . . .
>
> And so, here disclosure of defendant's activities bears a substantial relation to a legitimate interest which is asserted by the Government to justify the disclosure. The governmental interest may fairly be said to outweigh any possible infringement of the First Amendment rights of the defendant's members or contributors.

Attorney Gen. v. INAC, 346 F.Supp. 1384, 1390–91 (S.D.N.Y.), aff'd mem., 464 F.2d 1405 (2d Cir.), cert. denied, 409 U.S. 1080, 93 S.Ct. 679, 34 L.Ed.2d 669 (1972) (footnotes omitted) (emphasis added). See also FEA v. Algonquin SNG, Inc., 426 U.S. 548, 96 S.Ct. 2295, 49 L.Ed.2d 49 (1976); Buckley v. Valeo, 424 U.S. 1, 66–68, 71–72, 80–81, 96 S.Ct. 612, 657–658, 659–660, 663–664, 46 L.Ed.2d 659 (1976) (upholding disclosure requirements of the Federal Election Campaign Act of 1971 since they "directly serve substantial governmental interests" outweighing any "burden that they place on individual rights," id. at 68, 96 S.Ct. at 658); Zerilli v. Smith, 656 F.2d 705 (D.C.Cir.1981) (also supporting a "balancing" approach in a similar context) (discussed at pp. 952–953 infra). A greater deference should be given the political branches in the foreign relations context. See, e.g., Narenji v. Civiletti, 617 F.2d 745, 748 (D.C.Cir.1979), cert. denied, 446 U.S. 957, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980) (requiring, in the context of classifications among aliens, only a "rational basis" for such classifications since foreign policy considerations may be involved) (quoting Mathews v. Diaz, 426 U.S. 67, 81–82, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976) ("Any rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to chang-

Because the Attorney General's mandate under FARA is critical to the decision today, the statutory language, legislative history, and case law of the Act must be reviewed in some detail.

## 2. The meaning of FARA

Reviewing the language and history of FARA, and the case law under it, makes clear that the Attorney General may, consistent with the Act's scheme and Congress' intent, keep foreign policy, international political, and national security considerations in mind in his enforcement of the statute.

### a. Language of the statute

Before discussing the actual language of the statute, it merits mentioning that the Act is found in Title 22 of the U.S. Code, "Foreign Relations and Intercourse," at Chapter 11, "Foreign Agents and Propaganda." This is an immediate indication that we are dealing here with a statute whose underlying nature is rooted in international political considerations and the conduct of foreign policy. This also reflects, as should be kept in mind throughout our review of the statute and its history, that a deliberate major concern of Congress was to require the disclosure of the foreign principal behind *propaganda* activities.

These considerations are reflected most strongly in the Act's provisions themselves. In § 611, the definitional section, one criterion of an "agent of a foreign principal" is that he "engage[ ] within the United States in *political activities* for or in the interests of such foreign principal." [26] "Public-relations counsel" are limited to persons representing a principal in matters "pertaining to *political or public interests, policies, or relations of such principal.*" [27] Section 611(e) "government of a foreign country," § 611(f) "foreign political party," § 611(j) "political propaganda," § 611(o) "political activities," and § 611(p) "political consultant" are all naturally defined in political terms also. The limitation of the Act to political behavior indicates its preeminent concern with international political and domestic security matters.

That the Act was geared toward use in the foreign policy and national security areas is also reflected by the limitation of the term "political propaganda" to matters involving the political interests of foreign governments and parties, United States "foreign policies," United States "dissensions," or "any racial, social, political, or religious disorder, civil riot, or other conflict involving the use of force or violence in any other American republic," [28] where "American republic" is limited to those "states which were signatory to the Final Act of the Second Meeting of the Ministers of Foreign Affairs of the American Republics at Habana, [sic] Cuba, July 30, 1940." [29] It should also be obvious—and reviewing of the legislative history amply confirms this—that to the extent FARA focuses on subversion by foreign powers, foreign policy concerns become inevitable. The Attorney General may channel his limited resources against agents of those powers inimical to the United States, who are more likely to subvert our allies and interests.

Section 612(f) gives the criteria for exemption from the general filing requirements of § 612(a) [30]: "The Attorney Gener-

26. 22 U.S.C. § 611(c) (1976) (emphasis added).

27. *Id.* § 611(g) (emphasis added).

28. *Id.* § 611(j).

29. *Id.* § 611(*l*).

30. Section 612(a) states: "No person shall act as an agent of a foreign principal unless he has filed with the Attorney General a true and complete registration statement and supplements thereto as required ... or unless he is exempt from registration under the provisions of this subchapter."

ing world conditions should be adopted only with the greatest caution") and *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89, 72 S.Ct. 512, 518–19, 96 L.Ed. 586 (1952) ("Such matters [which are "vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government"] are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference")).

*See also* note 20 *supra.*

al may, by regulation, provide for the exemption— ... where by reason of the nature of the functions or activities of such person the Attorney General, *having due regard for the national security and the public interest*, determines that such registration, or the furnishing of such information, as the case may be, is not necessary to carry out the purposes of this subchapter." [31]

Broader exemptions are set out in § 613,[32] which declares that the requirements of § 612(a) "shall not apply to the following agents of foreign principals," and then lists seven categories of persons exempted. These categories are: "Diplomatic or consular officers"; "Official of foreign government"; "Staff members of diplomatic or consular officers"; "Private and nonpolitical activities; solicitation of funds"; "Religious, scholastic, or scientific pursuits"; "Defense of foreign government vital to United States defense"; and "Person qualified to practice law." With the exception of the last category, it is clear that all the exemptions are rooted in either foreign policy concerns or can be explained by the fact that Congress was interested in monitoring public and political activities, rather than private, nonpolitical, religious, scholastic, scientific, or similar activities which have only an attenuated relationship to foreign policy and national security.[33]

Section 614 is devoted to the "Filing and labelling of political propaganda," and § 621 requires that "[t]he Attorney General shall, from time to time, make a report to the Congress concerning the administration of this subchapter [i.e., FARA], including the nature, sources, and content of *political propaganda* disseminated or distributed." [34]

Finally, and perhaps most significant of all, § 616 requires the Attorney General promptly upon receipt [to] transmit one copy of every registration statement filed hereunder and one copy of every amendment or supplement thereto, and one copy of every item of political propaganda filed hereunder, *to the Secretary of State for such comment and use as the Secretary of State may determine to be appropriate from the point of view of the foreign relations of the United States.*[35]

Section 616 also authorizes the Attorney General

> to furnish to departments and agencies in the executive branch and committees of the Congress such information obtained by him in the administration of this subchapter, including the names of registrants under this subchapter, copies of registration statements, or parts thereof, copies of political propaganda, or other documents or information filed under this subchapter, *as may be appropriate in the light of the purposes of this subchapter.*[36]

b. *Legislative history*

That FARA was to serve a foreign policy-oriented role was apparent from the outset. It is worth noting that the registration functions originally belonged to the Secretary of State and were transferred to the Attorney General only in 1942.[37] The House Report[38] accompanying the original bill was entitled "Investigation of Nazi and Other Propaganda." The bill set out the results of the investigation of Naziism, Fascism, and Communism and other foreign-controlled political movements. The Report evinced a particular concern with violence

31. *Id.* § 612(f).

32. *Id.* § 613.

33. The lack of interest which Congress had in "nonpolitical" and "private" matters is restated in the legislative history of this section. *See* S. Rep.No.1061, 87th Cong., 1st Sess. 1 (1961), U.S.Code Cong. & Admin.News 1961, p. 3219. The Attorney General specifically endorsed this legislation. *Id.* at 3–4.

34. 22 U.S.C. § 621 (1976) (emphasis added).

35. *Id.* § 616(b) (emphasis added).

36. *Id.* § 616(c) (emphasis added).

37. *See* Exec. Order No. 9176, 7 Fed.Reg. 4127 (1942).

38. H.R.Rep.No.153, 74th Cong., 1st Sess. (1935).

and of course with foreign control.[39] Concern was also expressed with the fact that the movements sought to influence "our governmental policies."[40] The Report concluded:

> . . . .
>
> 2. That Congress should enact a statute conferring upon the Secretary of Labor authority to shorten or terminate the stay in this country of any visitor admitted here under temporary visa, whenever in the judgment of the Secretary such visitor shall engage in the promotion or dissemination of propaganda or engage in political activity in the United States.
>
> 3. We recommend that the Department of State, in collaboration with the Department of Labor, negotiate treaties and agreements with foreign nations by which such nations shall agree to receive back any persons entering this country from such foreign nation at any time such immigrant shall become subject to deportation under our laws.
>
> . . . .
>
> 6. That Congress should make it an unlawful act for any person to advocate changes in a manner that incites to the overthrow or destruction by force and violence of the Government of the United States, or of the form of government guaranteed to the several States by article IV, section 4, of the Constitution of the United States.[41]

The focus on radical violence and foreign affairs was to be a recurrent theme in the legislative history of not only the initial passage of FARA but also of its subsequent amendments. These themes significantly illuminate today's case.

The House Report of the 75th Congress[42] in 1937 declared that the basic purpose of the Act was to focus a "spotlight of pitiless publicity" on those organizations financed by "foreign governments or foreign political groups" to spread propaganda and thereby "influence the external and internal policies of this country."[43] This Report emphasized that the purpose of the Act was disclosure rather than prohibition. Moreover, the Report continued, "the provisions of this measure [will] have no reference to nor include any person performing only private, non-political, financial, mercantile, commercial, or other activity in furtherance of bona-fide trade or commerce of a foreign principal."[44] The Senate Report[45] of the same Congress incorporated the House Report.[46]

The 77th Congress amended the 1938 version of the Act. The Senate Report outlining the changes made in the Act was dated nine days after the attack on Pearl Harbor.[47] It stated that the Act was "prefaced by a section stating the policy and purpose of the statute and emphasizing its function as a means of enabling the people of the United States to appraise the propaganda and other activities of foreign agents in the light of their association and background."[48] The section read:

### POLICY AND PURPOSE

*It is hereby declared to be the policy and purpose of the Act to protect the national defense, internal security, and foreign relations of the United States by requiring public disclosure by persons engaging in propaganda activities and other activities for or on behalf of foreign governments, foreign political parties, and other foreign principals so that the Government and the people of the United States may be informed of the identity of such persons and may appraise their*

---

39. *Id.* at 13, 20, 23, 24.

40. *Id.* at 7.

41. *Id.* at 23–24.

42. H.R.Rep.No.1381, 75th Cong., 1st Sess. (1937).

43. *Id.* at 1–2.

44. *Id.* at 2.

45. S.Rep.No.1783, 75th Cong., 3d Sess. (1938).

46. *Id.* at 1–2.

47. S.Rep.No.913, 77th Cong., 1st Sess. (1941).

48. *Id.* at 9.

statements and actions in the light of their associations and activities.[49]

The Report also incorporated a letter from Attorney General Biddle endorsing the Act and emphasizing the "nonpolitical nature" of the exemptions allowed.[50] Again, the international political and foreign policy considerations were obvious in both the amendments to the Act and their genesis.

The House Report [51] of that session spoke of the "transfer [of administration] of the Act from the Department of State to the Department of Justice." [52] In this vein, the Report continued: *"The [amended] section also provides coordination with the State Department by providing that it shall receive a copy of each registration statement for examination from the point of view of the foreign relations of the United States."* [53]

One interesting highlight of the amendments proposed in 1941 and 1942 further illuminates the foreign policy and international political considerations inherent in the Act. Certain sections of the bill were rejected [54] by President Roosevelt as putting too great a strain on our relations with wartime allies whose agents might have to register under the terms of the original amendments.[55] Subsequently, therefore, an exemption was added to the Act for agents "whose foreign principal is a government of a foreign country the defense of which the President deems vital to the defense of the United States ...." [56] The amendment was made pursuant to a suggestion by Attorney General Biddle, the letter accompanying which is incorporated in both the subsequent House Report and Senate Report,[57] and this provision remains in the current version of the law.[58] When a foreign principal is deemed to be a government essential to the defense of the United States,

such government of a foreign country [must] furnish[ ] to the Secretary of State for transmittal to, and retention for the duration of [the Act] by, the Attorney General such information as to the identity and activities of such person or employee at such times as the Attorney General may require. Upon notice to the Government of which such person is an agent or to such person or employee, *the Attorney General, having due regard for the public interest and national defense, may, with the approval of the Secretary*

---

49. *Id.* at 1 (emphasis added). This statement of purpose has been incorporated by the Department of Justice in its own pamphlet on FARA. *See* p. 945 *infra.*

50. *Id.* at 11.

51. H.R.Rep.No.1547, 77th Cong., 1st Sess. (1941).

52. *Id.* at 2.

53. *Id.* at 4 (emphasis added).

54. *See* Letter from President Roosevelt to the House of Representatives, 9 February 1942, *reprinted in* 88 Cong.Rec. 1139 (1942).
   The final version of the bill passed by the Senate and Congress in 1941 was, except for these sections, identical to the one rejected by President Roosevelt earlier that year. The House and Senate Reports at that time incorporated the earlier House and Senate Reports by reference. H.R.Rep.No.2038, 77th Cong., 2d Sess. 3 (1942); S.Rep.No.1227, 77th Cong., 2d Sess. 3 (1942).

55. Ironically, the original version passed by Congress was more deferential to the Soviet Union than some legislators had wanted. One proposed amendment to the original bill would have expressly mentioned "the Communist Party of the United States, the German-American Bund, and Kyffhauserbund" as "persons" within the meaning of the Act. After an extensive debate on the floor of the House this amendment was rejected. The rationale behind the rejection of this amendment, like the rationale of the entire bill, was expressly rooted in foreign policy and political considerations. Specifically, those speaking against the amendment cited the necessity of not offending the Russians at a time when we were fighting a common enemy; those supporting the amendment cited the need to recognize that, although we were fighting Nazi Germany together, the interests of the United States and Stalinist Russia remained diametrically opposed. *See* 88 Cong.Rec. 797–806 (1942).

56. Ch. 263, § 3(f), 56 Stat. 254 (1942).

57. H.R.Rep.No.2038, 77th Cong., 2d Sess. 2–3 (1942); S.Rep.No.1227, 77th Cong., 2d Sess. 2–3 (1942).

58. 22 U.S.C. § 613(f) (1976).

*of State, and shall, at the request of the Secretary of State, terminate in whole or in part the exemption herein of any such person or employee ....* [59]

Thus, Congress amended the Act specifically to prevent its hampering of relations with friendly countries. If agents of foreign principals essential to our defense may be exempted from FARA altogether for the sake of our foreign policy, then it is certainly within the intent of the Act that in his enforcement the Attorney General may consider the identity of an unfriendly principal and the wishes of our allies.

In 1950 the definitional section of FARA was amended to include "a new category of persons within the definition of the term 'agent of a foreign principal.' The new category consist[ed] of persons who have knowledge of or have received instruction or assignment in the espionage, counter espionage, or sabotage service of a foreign government or political party ...." [60] This part of FARA is now incorporated in sections 851 and 852 of Title 50, "War and National Defense." The 1950 amendments were part of the Internal Security Act of 1950, the primary purpose of which was "to combat un-American activities by requiring the registration of Communist organizations ...." [61] Thus Congress modelled FARA precisely so that it could be used against those organizations inimical to American interests.

Further amendments were added to FARA in 1966. Again, Congress' concern with political, and not apolitical, activity underscored the international political and domestic security focus of the Act. [62] The

Report also stated: *"The Secretary of State will be provided copies of the registration statements and political propaganda filed with the Department of Justice under the requirements of the [A]ct,"* "[c]ontingent fee contracts between agents and foreign principals based upon success in political activities to be undertaken by the agent are banned," and "[c]ampaign contributions for or in behalf of a foreign principal are prohibited in connection with any election to public office or in connection with any primary election or convention to select candidates for office." [63]

That Congress intended and desired that the legislation be sensitive to the requirements of national security was reflected by its statement that some changes in the statutory language had to be made since many of the earlier provisions had been dictated by the "prewar circumstances surrounding enactment of the law." [64] The section-by-section analysis [65] of the proposed amendments stated that they

would take into account the change of circumstances of the present day by requiring a showing not only of foreign connections but also of certain activities performed by the agent for foreign interests which are either political in nature or which are carried on in particularly sensitive areas in which the line between political and non-political action is difficult to define. [66]

The House Report also stated that the phrase "political or public interests, policies, or relations," referred to "matters which on the domestic governmental level would be called a policy matter, in the international

---

**59.** *Id.*

**60.** H.R.Rep.No.3112, 81st Cong., 2d Sess. 53 (1950).

**61.** H.R.Rep.No.2980, 81st Cong., 2d Sess. 1 (1950), U.S.Code Cong.Serv. 1950, p. 3886.

**62.** *See, e.g.,* H.R.Rep.No.1470, 89th Cong., 2d Sess. 2–3 (1966), U.S.Code Cong. & Admin. News 1966, pp. 2397, 2398.

**63.** *Id.* at 3 (emphasis added), U.S.Code Cong. & Admin.News 1966, p. 2399.

**64.** H.R.Rep.No.1470, 89th Cong., 2d Sess. 4 (1966), U.S.Code Cong. & Admin.News 1966.

**65.** The House Report adopted, with only minor changes, the section-by-section analysis of S. Rep.No.143, 89th Cong., 1st Sess. 6–16 (1965).

**66.** H.R.Rep.No.1470, 89th Cong., 2d Sess. 4 (1966), U.S.Code Cong. & Admin.News 1966, p. 2400. The bill was apparently prompted also by the behavior of "foreign sugar lobbyists" and "others whose conduct was criticized as a result of the Senate hearings."

context may be called questions concerning a country's foreign relations, and in the context of party politics may be termed matters involving the national interest." [67]

The House Report emphasized that one of the new subsections

> would require the Attorney·General to transmit to the Secretary of State not only the initial registration statement, as under existing law, but, in addition, supplemental and amendatory statements in propaganda filed with him by agents. *The Secretary of State would be authorized to comment on the statements and to make such use of them and the related material as seems appropriate from the standpoint of the Nation's foreign relations. This, for example, would enable the Secretary of State to make American embassies and other missions more fully informed of the activities of agents of foreign principals.*[68]

The Report pointed out that a new subsection would authorize the Attorney General to circulate copies of acquired material

> to other branches, agencies and officials of the Government, as appropriate. It would, for example, be appropriate in light of the purposes of the act for such statements of propaganda to be forwarded to specific agencies named in the statements as the object of the agent's political activities or to congressional committees concerned with legislation which, according to the material filed by the agent, is the subject of his interest.[69]

It should be mentioned that departmental reports on the 1966 amendments were received from agencies involved with Ameri-

can foreign relations, while an agency concerned with foreign relations only to the extent that they have impact on non-political activities made the determination that comment would be inappropriate.[70]

The Senate Report[71] for the 1966 amendments made some important additional points. In its discussion of the bill's main purpose, it stated that the amendments were "intended to protect the interests of the United States" by requiring disclosure by agents "acting for or in the interests of foreign principals where their activities are political in nature or border on the political." These disclosures would "permit the Government and the people of the United States to be informed as to the identities and activities of such persons and so be better able to appraise them and the purpose for which they act."[72]

The amendments were also "aimed at better focusing the act on those individuals attempting to influence Government policies through political activities."[73] In particular, the amendments were tailored to provide better disclosure when agents were "contacting Members or committees of the Congress or Government officials on policy matters in behalf of their foreign principal ...."[74] The Report noted the "persistent efforts by numerous agents of foreign principals to influence the conduct of U. S. foreign and domestic policies *using techniques outside the normal diplomatic channels.*"[75] The Report found it "noteworthy that the increased tempo of nondiplomatic activity has picked up in almost direct proportion to our Government's growing politi-

---

**67.** *Id.* at 7 (1966), U.S.Code Cong. & Admin. News 1966, p. 2403. The passage was taken from S.Rep.No.143, 89th Cong., 1st Sess. 9 (1965).

**68.** H.R.Rep.No.1470, 89th Cong., 2d Sess. 14 (1966), U.S.Code Cong. & Admin.News 1966, p. 2410. The passage was taken from S.Rep.No. 143, 89th Cong., 1st Sess. 13 (1965). The section referred to is now at 22 U.S.C. § 616 (1976).

**69.** H.R.Rep.No.1470, 89th Cong., 2d Sess. 14 (1966), U.S.Code Cong. & Admin.News 1966, p. 2410.

**70.** *Id.* at 15–21.

**71.** S.Rep.No.143, 89th Cong., 1st Sess. (1965).

**72.** *Id.* at 1.

**73.** *Id.*

**74.** *Id.* at 2.

**75.** *Id.*

cal, military, and economic commitments around the world." [76]

Given the established linkage between the defendant, INAC, and the IRA,[77] clearly the statutory objectives are consonant with the registration of the defendant.

### c. Case law

Soon after FARA was originally enacted the Supreme Court had occasion to elucidate the purpose of the Act in *Vireck v. United States*.[78]

> The Act of 1938 requiring registration of agents for foreign principals was a new type of legislation adopted in the critical period before the outbreak of the war. The general purpose of the legislation was to identify agents of foreign principals *who might engage in subversive acts or in spreading foreign propaganda*, and to require them to make public record of the nature of their employment.... These means [used to accomplish the ends of the statute] included the requirement of registration of agents for foreign principals ... and the requirement that the registrant give certain information concerning his activities as such agent.[79]

Only Justices Black and Douglas dissented from the Supreme Court's opinion in *Viereck*, and they did so on grounds unrelated to the majority's statement of the general purpose of the statute. They also stated the purpose of FARA:

> The general intent of the Act was to prevent secrecy as to any kind of political propaganda activity by foreign agents. Both the House and Senate Committees reporting the Bill under consideration declared it to be their purpose to turn "the spotlight of pitiless publicity" upon the propaganda activities of those who were hired by foreign principals. Appreciating

that "propaganda efforts of such a nature are usually conducted in secrecy," they wanted to make full information concerning it "available to the American public" and sought by "the passage of this bill" to "force propaganda agents representing foreign agencies to come out 'in the open' in their activities, or to subject themselves to the penalties provided in said bill." [1] They declared that the purpose of the Bill was to require all such hired agents "to register with the State Department and to supply information about their *political activities*, their employers, and the terms of their contracts." [2]

What emerged from extended Congressional investigations, hearings and deliberations was this Act, intended to provide an appropriate method to obtain information essential for the proper evaluation of political propaganda emanating from hired agents of foreign countries. As the House and Senate Committees considering the Bill said, it "does not in any way impair the right of freedom of speech, or of a free press, or other constitutional rights." Resting on the fundamental constitutional principle that our people, adequately informed, may be trusted to distinguish between the true and the false, the bill is intended to label information of foreign origin so that hearers and readers may not be deceived by the belief that the information comes from a disinterested source. Such legislation implements rather than detracts from the prized freedoms guaranteed by the First Amendment. No strained interpretation should frustrate its essential purpose.

---

[1] Senate Report No. 1783, House Report No. 1381, 75th Cong., 3d Sess.

---

**76.** *Id.*

**77.** Judge Haight so found in *Attorney Gen. v. INAC*, 530 F.Supp. 241 at 258–260, 262–264 (S.D.N.Y.1981), and was affirmed by the Second Circuit on 5 January 1982, 668 F.2d 159.

**78.** 318 U.S. 236, 63 S.Ct. 561, 87 L.Ed. 734 (1943).

**79.** *Id.* at 241, 63 S.Ct. at 563 (emphasis added).

2 The House Committee hearings, which are available in manuscript form only, show the same broad purpose. In explaining the Bill to the House Committee, its author pointed out that *it was particularly aimed at firms, groups, or businesses, used "as a means for that particular country or political party to hide its identity"* and that the Bill covered "all activities of all kinds, that is, all propaganda activities, no matter from what source it emanates." The Congressional Committee, whose Chairman was the author of this Bill, had discovered through hearings, that business enterprises had been utilized as a means for propagandizing, and that many persons including the petitioner here had published articles in various magazines, concealing their identity behind pseudonyms. The purpose of these activities, the Committee found, had been to influence "the policies, external and internal, of this country, through group action. They were employing the same method that they had employed in Germany for the purpose of obtaining control of the government over there." [80]

*United States v. Peace Information Center* [81] quoted extensively from the original House Report in finding that "[t]he intent and purpose of the Congress in enacting [FARA]" was to " 'publicize' " those " 'propagandists' " who seek to " 'influenc[e] American political opinion on a political question.' " [82] It quoted *Viereck* in finding that the " 'general purpose' " of this " 'new type of legislation adopted in the critical period before the outbreak of the war' " was to " 'identify agents of foreign principals who might engage in subversive acts or in spreading foreign propaganda, and to require them to make public record of the nature of their employment.' " [83] The main focus of *Peace Information Center* was on the constitutionality *vel non* of the Act, and its finding that FARA was constitutional was based largely on Congress' broad authority to legislate on matters concerning foreign relations and national defense.

That the Attorney General may properly factor in national security, international political, and foreign policy considerations was reflected also in an opinion by Judge Bauman in 1972,[84] in which he ordered the alleged principal in our case, INAC, to produce its books and records for officials charged with the enforcement of FARA:

The purpose of the Act is to protect the interests of the United States by requiring complete public disclosure by persons acting for or in the interests of foreign principals where their activities are political in nature. These disclosures offer the Government and our people the opportunity to be informed and therefore enable them to understand the purposes for which they act.

The Act is founded upon the indisputable power of the Government to conduct its foreign relations and to provide for the national defense. . . .

. . . Its purpose is to meet the Government's need for records necessary to enforce its national defense and foreign policies.[85]

He went on to point out that INAC

engages in activities designed to promote the cause of one faction in the current dispute in Northern Ireland. Its fund raising and propaganda activities may well be designed to influence American policy or, put most charitably, may result in serious complications for the Government in its conduct of foreign affairs.[86]

Most recently Judge Haight began his opinion—wherein he found INAC to be an agent of the Irish Republican Army and ordered it to comply with FARA—with the recognition that "[t]he general purpose of the Act is to protect the security and foreign relations of this country by requiring

80. *Id.* at 250–51, 63 S.Ct. at 567–68 (emphasis added in note 2).

81. 97 F.Supp. 255 (D.D.C.1951).

82. *Id.* at 258–59 (quoting H.R.Rep.No.1381, 75th Cong., 1st Sess. 2 (1937)).

83. *Id.* at 259 (quoting *Viereck*, 318 U.S. at 241, 63 S.Ct. at 563).

84. *Attorney Gen. v. INAC*, 346 F.Supp. 1384 (S.D.N.Y.), *aff'd mem.*, 465 F.2d 1405 (2d Cir.),

cert. denied, 409 U.S. 1080, 93 S.Ct. 679, 34 L.Ed.2d 669 (1972).

85. *Id.* at 1390 (footnote omitted).

86. *Id.* at 1391. This passage was quoted approvingly, albeit in a different context, by Judge Haight in his opinion. *Attorney Gen. v. INAC*, 530 F.Supp. 241 at 258 (S.D.N.Y.1981), *aff'd*, 668 F.2d 159 (2d Cir. 1982).

agents of foreign principals to identify themselves and disclose their activities." [87]

Finally, the pattern of criminal prosecutions under FARA has, from the beginning, reflected the foreign policy and national security concerns of our Government, and Congress has never indicated any disapproval. The first three prosecutions brought, from 1939–40, involved the Soviet Union. Then, from 1940 through the end of World War II, of the sixteen prosecutions brought eleven involved Germany. The remaining five were divided, significantly, among Japan, Italy, Finland, Rumania, and Spain. In 1963 the Department of Justice reported that since World War II there have been twelve additional prosecutions. The principals alleged were, again, as we would expect: three prosecutions involved the Soviet Union, five Cuba, one Rumania, two the Dominican Republic, and one the Committee of World Congress of the Defenders of Peace. [88] In the Justice Department's own pamphlet *The Foreign Agents Registration Act of 1938 as Amended*, it is stated that the policy and purpose of the Act is

> to protect the national defense, internal security, and foreign relations of the United States by requiring public disclosure by persons engaging in propaganda activities and other activities for or on behalf of foreign governments, foreign political parties, and other foreign principals so that the Government and the people of the United States may be informed of the identity of such persons and may

appraise their statements and actions in light of their associations and activities. [89]

### 3. Conclusion

A review of the language, history, and case law of the Foreign Agents Registration Act demonstrates that it was inspired by national security, international political, and foreign policy considerations. The design and use of FARA has reflected the evolving concerns of American foreign policymakers. It was prompted by and first used extensively against Fascism and Nazism in the 1930s and then during World War II itself, was then aimed more toward the Soviet Union and its allies in the postwar period, and—apparently—today is being employed for disclosing links with international terrorists. [90] The Attorney General has only limited time and money to spend on enforcement, and may, consistent with the Constitution and the statute, channel his efforts in a way consistent with the underlying purpose of the Act. There is nothing in the district court's opinion to demonstrate that he acted in a way inconsistent with FARA's rationale—to the contrary. The Attorney General was entitled in the case before us to take into account the wishes of our allies and the uncongeniality of the prospective registrant's ultimate principal. [91] Unless the district court finds that the documents at issue demonstrate colorably he did more than this, there has been no colorable showing of improper motivation.

**87.** *Attorney Gen. v. INAC*, 530 F.Supp. 241 at 245 (citing *Viereck v. United States*, 318 U.S. at 251, 63 S.Ct. at 568 (Black, J., dissenting)).

**88.** *Hearings Before the Senate Comm. on Foreign Relations: Activities of Non-Diplomatic Representatives of Foreign Principals in the United States*, 88th Cong., 1st Sess. 70–73 (Part I) (1963), *reprinted in* J.A. at 145–48.

**89.** U. S. DEPT OF JUSTICE, THE FOREIGN AGENTS REGISTRATION ACT OF 1938 AS AMENDED AND THE RULES AND REGULATIONS PRESCRIBED BY THE ATTORNEY GENERAL 7 (undated). This repeats the statement of "POLICY AND PURPOSE" given in S.REP.No. 913, 77th Cong., 1st Sess. 1 (1941). *See* pp. 939–940 *supra*.

**90.** Besides the case involving the IRA before us, the other conspicuous recent use of FARA was to require Billy Carter's registration as an agent of Libya in 1980.

**91.** Note also that apparently "the U. S. government has a long standing policy against granting visas to IRA members." Hosenball, *Irish Burlesque*, THE NEW REPUBLIC, 3 March 1982, at 10. While this policy is constitutionally distinguishable, it would be at least anomalous to hold that visas could be denied for motives which are improper in requiring registration.

### B. *Lack of Selection*

■ Even before the district court reached the question of *improper motive*, it should have considered whether there had been any *selection*. Defendant must make a colorable showing that he has been especially singled out, that there exist persons similarly situated who have not been prosecuted. Without such a showing, it is irrelevant that the British or Irish may also have wanted the suit brought.

This court recently had occasion to consider the selective prosecution defense in *United States v. Diggs*.[92] It is clear from *Diggs* that a demonstration of selection is indispensable for the defense and that the burden of so demonstrating lies squarely on the defendant. *Diggs* established a two-step process, under which the determination of selection should come first. And whether a judge determines the discrimination or selection first or last, at some point he *must* make this determination. *In the case at hand, however, not only was there no showing that the selection was improperly motivated, there was no showing that there had been any selection at all.*

The two elements of discriminatory selection and improper motive might be compared to the two elements of conspiracy, i.e., an agreement making up the conspiracy plus an overt act carrying the conspiracy into effect. Chronologically, in the case of discriminatory prosecution, the two steps are reversed in time, but we must have both. The improper motive compares to the agreement for an illegal object; the actual discriminatory selection compares to the overt act. Both elements are necessary for a conspiracy charge and both elements must be clearly and separately shown for a selective prosecution defense.

■ As stated in *United States v. Scott* :

In order to prevail in this allegation [of selective prosecution] appellant must bear the burden of proving at least a prima facie case. This requires that appellant first demonstrate that others similarly situated generally have not been prosecuted for conduct similar to that for which he was prosecuted.[93]

The district court stated that "[t]he present case does not lend itself easily to such analysis [as in *Scott*], however, because of the manifest difficulty of finding others 'similarly situated' in the sense of voicing strong and regular opposition to the foreign policy (regarding Ireland) of a major United States ally (Great Britain)."[94] Concluding that the *Scott* test is inappropriate, however, assumes the conclusion. If there are few "similarly situated" to *The Irish People*, it is precisely because of its uniqueness that we would find it difficult to fault the Attorney General's decision to require it to register. If, as the district court found, there was no one to whom defendant could be compared in order to resolve the question of selection, then it follows that defendant has failed to make out one of the elements of its case. Discrimination cannot exist in a vacuum; it can be found only in the unequal treatment of people in similar circumstances.[95] Where defendant cannot show anyone in a similar situation who was not prosecuted, it has been held that he has not "met even the threshold point of the *Yick Wo* doctrine—'official discrimination . . . between persons in similar circumstances, material to their rights . . . .' "[96] Thus, if we accept the district court's conclusion that few are "similarly situated" with defendant—a tenuous assertion, in light of our discussion below[97] of past registrations—we would not find for defendant.

**92.** 613 F.2d 988 (D.C.Cir.1979), *cert. denied*, 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 838 (1980).

**93.** 521 F.2d 1188, 1195 (9th Cir. 1975), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1431, 47 L.Ed.2d 361 (1976) (involving alleged failure to file income tax forms).

**94.** Mem. op. at 3, J.A. at 114.

**95.** *See Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *United States v. Elliott*, 266 F.Supp. 318 (S.D.N.Y.1967).

**96.** *United States v. Elliott*, 266 F.Supp. 318, 324 (S.D.N.Y.1967).

**97.** P. 946 *infra.*

This was, indeed, precisely the conclusion reached by Judge Haight in *Attorney General v. INAC*,[98] a "comprehensive opinion" [99] recently affirmed by the Second Circuit. There the court ordered INAC—the alleged principal in our case [100]—to register under FARA as an agent of the IRA. Judge Haight used the same two-pronged test we do today, relying on the Second Circuit case of *United States v. Berrios*.[101] He found, as we do, that neither part of the test had been met.[102] Specifically with regard to the lack of selection, he stated, "Even assuming that [INAC] has satisfied [the "improper motive"] prong of the *Berrios* test, *it has pointed to no instances in which others allegedly in violation of the Act have not been prosecuted. The absence of such proof, by itself, defeats the defense.*" [103]

Moreover, in choosing to rely on what it believed to be an alternative test found in some other cases,[104] the district court in our case incorrectly concluded that these alternative tests obviated the need for the threshold examination of selection. To the contrary, a careful reading of these cases shows no deviation from the established two-step test of establishing selection and then the motive for selection. The passages cited by the district court from these cases deal not with the essential elements of the defense but with the degree to which these elements must be established before defendant can prevail. Indeed, in each case the need for the establishment of the fact of selection is recognized.[105] At any rate, we reaffirm that *Diggs* is the controlling case for this Circuit.

Concluding that defendant failed to make out the first part of the two-element test for selective prosecution, and that both elements are required for the defense, does not quite end the inquiry, however. There remains the issue of whether this being so, there is no necessity of showing both where all that is being sought is *discovery.* Thus, the district court's opinion may be read as requiring less than the two-part test for deciding whether discovery is appropriate, even if the two-part test is still necessary for the selective prosecution claim itself.

Again following *Diggs*,[106] we can see no reason for throwing out half the standard on the discovery issue. If either part of the test is failed, the defense fails; thus it makes sense to require a colorable claim of both before subjecting the Government to discovery. Since it is well established that, even in the context of a criminal prosecution, the Government enjoys a presumption of having "undertaken [the action] in good faith and in nondiscriminatory fashion," [107]

---

98. 530 F.Supp. 241 (S.D.N.Y.1981), *aff'd*, 668 F.2d 159 (2d Cir. 1982).

99. *Attorney Gen. v. INAC*, 668 F.2d 159 at 160 (2d Cir. 1982).

100. The alleged three-link IRA–INAC–*The Irish People* relationship is discussed at note 2 *supra*.

101. 501 F.2d 1207 (2d Cir. 1974).

102. Mem. op. at 17–20.

103. *Id.* at 20 (citing *Berrios*, 501 F.2d at 1211–12) (emphasis added).

104. They were cited and discussed at pp. 3–4 of the memorandum opinion, J.A. at 114–15. They are: *United States v. Peskin*, 527 F.2d 71, 85–86 (7th Cir. 1975), *cert. denied*, 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1976); *United States v. Oaks*, 508 F.2d 1403, 1404 (9th Cir. 1974); *United States v. Berrios*, 501 F.2d 1207, 1211–12 (2d Cir. 1974); *United States v. Berrigan*, 482 F.2d 171, 177 (3d Cir. 1973); *United*

States v. Falk, 479 F.2d 616, 620–21 (7th Cir. 1973) (en banc).

105. *See Peskin*, 527 F.2d at 85–86; *Oaks*, 508 F.2d at 1404, and later proceeding at 527 F.2d 937, 940 (9th Cir. 1975), *cert. denied*, 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1191 (1976); *Berrios*, 501 F.2d at 1211; *Berrigan*, 482 F.2d at 173, 179; *Falk*, 479 F.2d at 619–23. Indeed, it was *Berrios* on which Judge Haight relied in his own application of the two-pronged selective prosecution test in *Attorney Gen. v. INAC*, 530 F.Supp. 241 at 254 (S.D.N.Y.1981), *aff'd*, 668 F.2d 159 (2d Cir. 1982). *See* preceding paragraph in text and note 11 *supra*. It should also be noted that *Peskin* and *Berrigan* held there was no selective prosecution defense shown because of a failure to show improper motivation, so the courts there need not have decided the selection question anyway.

106. 613 F.2d at 1003–04.

107. *Falk*, 479 F.2d at 620.

it also makes sense that the burden be generally on the defendant to show the necessary elements at each procedural stage.

We think even the cases relied on by the district court as support to the contrary bear this out.[108] In *United States v. Berrios* the court stated that, before it allowed the requested discovery, it would "require some evidence tending to show the existence of *the essential elements* of the [selective prosecution] defense"—not *an* essential element—and that "the documents in the government's possession would indeed be probative of these *elements*."[109] *Berrios* thus pointed out that defendant there had "not pointed to a single unprosecuted violation . . . on the part of others, even though proof of *this essential element* would not necessarily be in the government's exclusive control."[110] We do not believe the other cases cited by the district court are supportive either. *Berrigan* required a "colorable basis"[111] for the defense, and it seems to us that if an essential half of the defense is not colorable then there is no such "colorable basis." This was, incidentally, exactly the approach taken in *Diggs*.[112] The same is true of the *Oaks* requirement that the claim be taken "past the frivolous stage";[113] *Oaks*, moreover, required "an initial factual showing" of "impermissible discrimination"[114]—which, in that case's context, sounds like an amalgam of both elements. In *Peskin*, it is our reading of

the case that the hearing for defendant's selective prosecution claim was denied precisely on the test of no improper motive *alone*. The same is true of *Berrigan*. In the last case relied upon by the district court, *Falk*, while it was held that defendant's selective prosecution claim was not without merit, it was done upon a finding that he had shown *both* elements.[115] Finally, we again affirm that *Diggs* controls for this Circuit.

▮ Defendant argues that it was selected "because of [the government's] hostility to the editorial policy of defendant, and the [Irish Republican] cause it espouses. . . ."[116] But if the question of selection is approached from the standpoint of the political issues involved in Northern Ireland and the defendant's support for one faction in the strife there, one finds that the Attorney General has sought and obtained the registration under FARA of persons representing a variety of political interests ranging from pro-loyalist to pro-Irish Republican.[117] Defendant thus has a difficult though not impossible task to show selection.[118]

Note that *all* eligible foreign agents are required to register under the Act, whether the Attorney General brings suit against them or not. Thus, it is not as if the Attorney General's discretion determined that defendant fell within the Act: all that was exercised here was the executive's pure enforcement power.

108. See note 104 *supra*.

109. 501 F.2d at 1211 (emphasis added).

110. *Id.* at 1212 (emphasis added).

111. 482 F.2d at 177, 181.

112. 613 F.2d at 1003–04.

113. 508 F.2d at 1404.

114. *Id.* at 1405.

115. 479 F.2d at 619–23.

116. Defendant's Answer, J.A. at 6–7.

117. Indeed, the Attorney General further claims in his brief at p. 9 n.8 that among those registrants are Betty Williams and Mairead Corrigan, founders and leaders of the Community of the Peace People and the recipients of

the Nobel Peace Prize for their efforts in Northern Ireland. The identities of all these registrants and their foreign principals are contained in the REPORT OF THE ATTORNEY GENERAL TO THE CONGRESS OF THE UNITED STATES ON THE ADMINISTRATION OF THE FOREIGN AGENTS REGISTRATION ACT OF 1938, AS AMENDED, FOR THE CALENDAR YEAR 1979, 386–89 (1980), *reprinted in* J.A. at 151–54. We note that the State Department has been similarly even-handed in its denial of visas to extreme spokesmen on both sides of the Irish question. Hosenball, *Irish Burlesque*, THE NEW REPUBLIC, 3 Mar. 1982, at 10–11.

118. We do not, however, rule out the possibility that on remand the district court may find adequate evidence of selection and improper motive. We say only that there is no indication in its opinion that it has found any so far.

If the Government has a valid ground to bring this action, then presumptively it has every right and duty to do so. It would be anomalous to allow *The Irish People* to escape the duty to register as a foreign agent solely because registration would create joy in Whitehall or Dublin. The interests of the United States Government are paramount, and if there was actually no selection, then all the correspondence from Britain and Ireland creating an aura of "improper" extraneous motive is beside the point: the first essential element of discriminatory selection has not been established.

III. THE IMPROPER DISMISSAL ISSUE

■ On remand the district court should reanalyze the documents at issue to determine whether, under the principles we have outlined, there remains a colorable showing of selective prosecution.[119] It should look to see whether there was selection and, if so, whether it was improperly motivated. We should also point out that even if the district court makes this finding, dismissal may be an inappropriate remedy for the Government's inability to produce the documents.

In reaching its conclusion that dismissal was proper the district court stated, "It would be inconsistent with the fundamental fairness required by due process to allow the Government to assert the defendant's guilt and then deny it the materials that might serve to exculpate it."[120] To support this proposition the court cited *United States v. Reynolds*[121] and *United States v. Andolschek.*[122] In the latter case, Judge Learned Hand stated,

> While we must accept it as lawful for a department of the government to suppress documents, even when they will

help determine controversies between third persons, we cannot agree that this should include their suppression in a criminal prosecution, founded upon those very dealings to which the documents relate, and whose criminality they will, or may, tend to exculpate. So far as they directly touch the criminal dealings, the prosecution necessarily ends any confidential character the documents may possess. . . . The government must choose; either it must leave the transactions and the obscurity from which a trial will draw them, or it must expose them fully.[123]

The district court quoted this passage and then concluded that a dismissal of the Government's action was proper in this case.

We disagree. Neither *Reynolds* nor *Andolschek* supports dismissal in this case. *Reynolds* involved a suit by the widows of three deceased civilian observers following the death of their husbands in the crash of a bomber. Plaintiffs sought production of the Air Force's official accident investigation report and the statements of the three surviving crew members. The Government moved to quash the motion, claiming that these matters were privileged against disclosure pursuant to Air Force regulations. Nonetheless, the district court ordered the Government to produce the documents in order that it might determine whether they contained privileged matter. The holding was affirmed on appeal, but the Supreme Court *reversed.* The Court stated:

> *Regardless of how it is articulated, some . . . formula of compromise must be applied here.* Judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers. Yet we will not go so far as to say that the court

**119.** Defendant contends that, even were the classified materials irrelevant to its selective prosecution defense, they are nonetheless relevant for other defenses. *See* Brief for the Defendant-Appellee at 27–28. It does not appear, however, that the district court has made such a finding so far. And, for the reasons discussed in this section, if such a finding were made it would not necessarily follow that dismissal would be the proper remedy for nondisclosure.

**120.** Mem. op. at 6, J.A. at 117.

**121.** 345 U.S. 1, 12, 73 S.Ct. 528, 534, 97 L.Ed. 727 (1953).

**122.** 142 F.2d 503 (2d Cir. 1944).

**123.** *Id.* at 506.

may automatically require a complete disclosure to the judge before the claim of privilege will be accepted in any case. It may be possible to satisfy the court, from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged. When this is the case, the occasion for the privilege is appropriate, and the court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers.[124]

The Court took judicial notice of the national security considerations in the case, and pointed out that a balance had to be struck between the competing claims of the two parties, taking into account the *necessity* of the evidence for plaintiff, and the national security considerations of defendants. The Supreme Court then stated:

> There is nothing to suggest that the electronic equipment, in this case, had any causal connection with the accident. Therefore, it should be possible for respondents to adduce the essential facts as to causation without resort to material touching upon military secrets. [Plaintiffs] were given a reasonable opportunity to do just that when [the Government] formally offered to make the surviving crew members available for examination.

We think that offer should have been accepted.[125]

As for *Andolschek*, which involved a criminal prosecution, the Supreme Court in *Reynolds* distinguished "those cases in the criminal field"[126] from the case that was before them. The Court cited *Andolschek* without approval, and Judge Hand himself carefully limited *Andolschek* to "cases involv[ing] the prosecution of a crime consisting of the very matters recorded in the suppressed document, or of matters nearly enough akin to make relevant the matters recorded."[127] That is not the case here.

Thus we hardly think that either *Reynolds* or *Andolschek* supports dismissal. On the contrary, *Andolschek* implicitly and *Reynolds* explicitly stand for the proposition that courts must balance a number of factors in determining how to proceed when one side or the other has claimed that certain evidence is privileged. Thus, even if defendant would normally be entitled to discovery, it does not follow that, if there can be no discovery in the particular case, dismissal is the only choice available to the court.

The parties dispute whether dismissal should be governed by Rule 37 of the Federal Rules of Civil Procedure. On the one hand, plaintiff argues that the Rule explicitly governs the permissible sanctions, including dismissal, for "Failure to Make or Cooperate in Discovery."[128] The district

---

**124.** 345 U.S. at 9–10, 73 S.Ct. at 532–33 (emphasis added).

**125.** *Id.* at 11, 73 S.Ct. at 533.

**126.** *Id.* at 12, 73 S.Ct. at 534.

**127.** 142 F.2d at 506.
  We note that defendant argues that it would be especially unfair to allow the Attorney General to proceed with his suit while invoking the state secrets privilege, when, as here, "defendant [is] in a civil enforcement action that may result in criminal penalties as well." Brief for Defendant-Appellee at 19. However, this is irrelevant since we can reach the question of whether the Government's actions necessitate a dismissal of criminal prosecution when and if such prosecution is brought. Moreover, defendant would be subject to criminal penalties only if he chose to violate the statute willfully. *See* 22 U.S.C. § 618(a) (1976).

**128.** The Rule provides that "the court in which the action is pending may take such orders in regard to the failure [to comply with a production order] *as are just*," and lists several possibilities "among others." Dismissal with prejudice is but one sanction available under Rule 37, and this ultimate sanction is neither greatly favored nor lightly invoked by the courts. Besides *Société Internationale*, the case discussed in the text at p. 952, *infra, see Emerick v. Fenick Indus., Inc.*, 539 F.2d 1379, 1381 (5th Cir. 1976) (dismissal is "a sanction of last resort"); *Dorsey v. Academy Moving & Storage, Inc.*, 423 F.2d 858 (5th Cir. 1970); *Anderson v. Nosser*, 438 F.2d 183 (5th Cir. 1971), *modified on other grounds*, 456 F.2d 835, *cert. denied*, 409 U.S. 848, 93 S.Ct. 53, 34 L.Ed.2d 89 (1972); *Bon Air Hotel, Inc. v. Time, Inc.*, 376 F.2d 118, 121 (5th Cir. 1967), *cert. denied*, 393 U.S. 815, 859, 89 S.Ct. 225, 131, 21 L.Ed.2d 179, 127 (1968) ("[t]he dismissal of an action with

court's 8 August 1980 order requiring the Attorney General to choose between producing the sought documents or suffering dismissal of his complaint does seem very like a production order.[129] On the other hand, defendant argues that the Rules authorize discovery only of information "not privileged," [130] and the documents here have been held, quite correctly, to be so privileged. Still, it seems unduly formalistic to cast Rule 37 aside and create a procedural vacuum in this situation, which seems at the very least closely analogous to that covered by the Rule.

Happily, this issue is of an intricacy disproportionate to its interest. What is critical is the fact that, whether Rule 37 applies or not, the district court erred in deciding that dismissal is necessarily the proper remedy when information which "might" be relevant to a selective prosecution claim is unavailable for discovery. Whether or not defendant's due process claim is considered under Rule 37 or independently of it,[131] it involves more than simply whether the materials sought "might serve to exculpate" defendant. Certainly the *possibility* of exculpation—if the defense of selective prosecution can be said to "exculpate" defendant—must be considered by the court, but other factors must be weighed as well: the *likelihood* that they will serve to exculpate defendant, their *necessity* for the defense,[132] *what defendant stands to lose* in the case, the *government's interest* in maintaining the material's *secrecy* and in successfully *bringing the action*, the *availability of alternatives* to a dismissal-or-disclosure order, and, generally, the parties' respective behavior, cooperation or lack of cooperation, and good or bad faith during the course of the lawsuit.

Even if Rule 37 does not apply, it makes sense to conclude that, in the absence of a specific rule, the court should fashion a remedy which balances the interests of the parties, rather than take a meat-ax approach.[133] Similarly, whether or not Rule

---

prejudice is a drastic remedy and should be applied only in extreme circumstances"); *Independent Prods. Corp. v. Loew's Inc.*, 283 F.2d 730, 733 (2d Cir. 1960) (concluding, in an analysis of *Société Internationale*, that "[t]he dismissal of an action with prejudice or the entry of a judgment by default are drastic remedies, and should be applied only in extreme circumstances"). *See also Loral Corp. v. McDonnell Douglas Corp.*, 558 F.2d 1130, 1133 (2d Cir. 1977); *Gill v. Stolow*, 240 F.2d 669, 670 (2d Cir. 1957) (overturning dismissal under Rule 37(d): "general principles cannot justify denial of a party's fair day in court except upon a serious showing of willful default"); 8 C. Wright & A. Miller, Federal Practice and Procedure § 2284 (1970); Annot., 2 A.L.R. Fed. 811, 819–22 (1969).

**129.** A production order is generally needed to trigger Rule 37(b). *See, e.g.*, 8 C. Wright & A. Miller, Federal Practice and Procedure § 2282 (1970), and cases cited therein. The Attorney General argues that the 8 August 1980 order was "tantamount to a production order," Brief for Plaintiff-Appellant at 12, since it imposed the penalty of dismissal contingent on the continued failure of the plaintiff to produce state secrets—something he clearly could not do consistently with his office and trust. Therefore, he concludes, the sanctions for failure to comply are governed by Rule 37(b)(2). *See Société Internationale v. Rogers*, 357 U.S. 197, 207, 78 S.Ct. 1087, 1093, 2 L.Ed.2d 1255 (1958); 8 C. Wright & A. Miller, Federal Practice and

Procedure § 2282 (1970). We note the tension between defendant's assertion that the district court's instruction to the government to produce evidence or drop the suit was *not* tantamount to a production order, and its second assertion that if the evidence is not produced the suit *must* be dropped.

**130.** Fed.R.Civ.P. 26(b)(1). *See Wehling v. Columbia Broadcasting Sys.*, 608 F.2d 1084, 1087 (5th Cir. 1979). *But cf.* note 135 and accompanying text *infra*.

**131.** Of course, if non-disclosure would deny defendant due process, then even if Rule 37 supported non-disclosure it could not be allowed. It seems to us, however, that due process is required by Rule 37 itself when it instructs the judge to take such actions as are "just."

**132.** I.e., the merits of plaintiff's selective prosecution defense can still be adjudicated even if these particular documents are not turned over to it. *See* pp. 954–955 *infra*.

**133.** We note that even in criminal cases Rule 16(d)(2) of the Federal Rules of Criminal Procedure states:

*Failure to Comply with a Request.* If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this

37 applies, the balancing we mandate will be somewhat different from—but just as critical—as in the usual Rule 37 case. In the latter context, courts are typically concerned with balancing the due process claim of a party *resisting* disclosure to his day in court against the court's need to vindicate its authority. Here, we are balancing the due process claims of the party *seeking* disclosure against the other party's interest in, inter alia, protecting valid privileges. We also point out that if Rule 37 limits dismissal when material is *not* privileged and there *is* a production order, then certainly if the material *is* privileged and there is *not* a production order—which plaintiff argues makes this a non-Rule 37 case—dismissal should also be limited. Thus, whether or not Rule 37 and the cases decided thereunder apply, they afford at the very least a proper and analogous framework demonstrating that a balancing of the parties' interests must be undertaken, and some of the factors to be considered in striking that balance.

In *Société Internationale v. Rogers*[134] the Supreme Court reversed the decision below to dismiss an action when one party failed to produce all the documents requested in discovery. Justice Harlan's opinion stated:

> In our opinion, whether a court has power to dismiss a complaint because of non-compliance with a production order depends exclusively upon Rule 37, which addresses itself with particularity to the consequences of a failure to make discovery by listing a variety of remedies

which a court may employ as well as by authorizing any order which is "just."[135]

The opinion concluded that "Rule [37] allows a court all the flexibility it might need in framing an order appropriate to a particular situation,"[136] thus recognizing the need to weigh the surrounding circumstances. In particular, the Supreme Court recognized as a valid distinction instances where the failure to produce documents was caused by inability on the part of a party, as opposed to willfulness or bad faith. In the discovery here, there has been no allegation of bad faith on the part of the Government. Indeed, plaintiff—like petitioner in *Société Internationale*—turned over several thousand pages of documents to defendant at its request or pursuant to earlier orders by the district court. The district court here had already found, moreover, that the documents plaintiff had were state secrets, and that plaintiff was under no duty to reveal them.[137]

Our recent holding in *Zerilli v. Smith*,[138] also seems relevant. That case involved an action by plaintiffs under the Privacy Act and the Fourth Amendment against the Justice Department. Plaintiffs' attempts in the suit to force disclosure of a reporter's sources under Rule 37 were rebuffed, however: "Because we believe that in this case the First Amendment interest in protecting a news reporter's sources outweighs the interest in compelled disclosure, we affirm the District Court's decision to deny the

---

rule ["Discovery and Inspection"], the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances. The court may specify the time, place and manner of making the discovery and inspection and may prescribe such terms and conditions as are just.

Thus, it is apparent that even in a criminal context the court is to undertake some balancing of the interests and consideration of the circumstances involved.

**134.** 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958).

**135.** *Id.* at 207, 78 S.Ct. at 1093. Also indicating that Rule 37 governs dismissal even where material is privileged are: *Emerick v. Fenick Indus., Inc.,* 539 F.2d 1379 (5th Cir. 1976); *Thomas v. United States,* 531 F.2d 746 (5th Cir. 1976); *Independent Prods. Corp. v. Loew's Inc.,* 283 F.2d 730 (2d Cir. 1960).

**136.** 357 U.S. at 208, 78 S.Ct. at 1094.

**137.** Other cases recognizing that the lack of bad faith of the defaulting party should be taken in to account include *Emerick, Bon Air Hotel, Dorsey, Anderson,* and *Gill,* cited at note 128 *supra.*

**138.** 656 F.2d 705 (D.C.Cir.1981).

motion to compel discovery." [139] This court noted in *Zerilli* that overwhelming precedent supports a balancing of interests when a privilege is asserted. [140] The court there balanced the two interests, the newspaper reporter's sources and the plaintiffs' interest in compelled disclosure, and concluded that compelled disclosure had the lighter weight. Only if we reduce our interests in national security and the confidentiality of our diplomatic and military communications to less than either a newspaper reporter's sources or compelled disclosure can we justify a dismissal here.

Similarly, in a case explicitly *denying* the applicability of Rule 37, the Fifth Circuit held in *Wehling v. Columbia Broadcasting System* that a district court's dismissal of a plaintiff's action when the defense sought privileged matter from him—precisely the situation here—was improper without a balancing of the parties' respective interests.

> [T]he [district] court should have measured the relative weights of the parties' competing interests with a view toward

accommodating those interests, if possible. This balancing-of-interests approach ensures that the rights of both parties are taken into consideration before the court decides whose rights predominate. [141]

In other non-Rule 37 cases—involving, like *Wehling*, claims brought by plaintiffs who then sought during discovery to invoke the Fifth Amendment privilege against self-incrimination—courts have ruled that dismissal is not automatic, that some balancing of the parties' interests is required, and that efforts at accommodation of both sides must be made. [142]

■ Balancing the relevant factors we outlined earlier [143] seems to us to make the case at hand rather easy. The likelihood of injustice to defendant is small indeed. As we pointed out before, no constitutional rights are threatened, only registration is imminent, no jail sentence looms. The civil/criminal distinction is important, and was emphasized by the courts in both *Reynolds* and *Andolschek*. [144] On the other hand, the

139. *Id.* at 707.

140. *Id.* at 711–12.

141. 608 F.2d 1084, 1088 (5th Cir. 1979) (citing Comment, *Penalizing the Civil Litigant Who Invokes the Privilege Against Self-Incrimination*, 24 U.FLA.L.REV. 541, 547 (1972); Note, *Use of the Privilege Against Self-Incrimination in Civil Litigation*, 52 VA.L.REV. 322, 335 (1966)).

142. *Black Panther Party v. Smith*, 661 F.2d 1243, 1270–74 (D.C.Cir.1981); *United States v. U. S. Currency*, 626 F.2d 11, 14–18 (6th Cir.), *cert. denied*, 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 290 (1980) ("Our focus must turn, then, to whether . . . there may be 'a solution which both protects the privilege and permits the . . . case to go forward'," *id.* at 14; "Clearly, appellees should not be compelled to choose between the exercise of their . . . privilege and the . . . subject of this . . . proceeding. On the other side of the coin, however, the government should not be compelled to abandon the . . . action which Congress, by enacting the statute, obviously intended to create. Therefore, the courts must seek to accommodate both the constitutional right against self-incrimination as well as the legislative intent behind the [statute]," *id.* at 15; "Indeed, 'because dismissal is a severe sanction, its use must be tempered,'" *id.* at 16; "There are several alternatives, short of outright dismissal, which might be appropriate here. The court is of the opinion that the court

below, in its discretion, may examine the possible approaches and, perhaps with the cooperation of the parties, select that means which 'strikes a fair balance . . . and . . . accommodates both parties'," *id.*) (citations omitted); *Lyons v. Johnson*, 415 F.2d 540, 541–42 (9th Cir. 1969), *cert. denied*, 397 U.S. 1027, 90 S.Ct. 1273, 25 L.Ed.2d 538 (1970).

Finally, it is interesting to note that in *United States v. Auhagen*, 39 F.Supp. 590, 591–92 (D.D.C.1941), one of the first cases brought after FARA's enactment, the District Court for the District of Columbia ruled, in a *criminal* action no less, that defendant's interest in "every reasonable opportunity to make his defense" could not outweigh the fact that the "difficulties involved in taking the deposition [he requested] are very great if not insurmountable."

143. P. 951 *supra*.

144. Note that we are *not* asserting that dismissal is never proper in a civil context, nor that the hardship undergone by civil parties sued by the Government is necessarily less than that undergone by criminal defendants. However, we do assert that in civil cases especially the proper approach to be taken by courts is one which balances the legitimate interests of both parties, and that the hardship to defendant will generally be less than in criminal cases (here, this is certainly true).

consequences of revealing the evidence are of the same magnitude as revealing the military secrets in *Reynolds*, a case where the Supreme Court decided to strike the balance on the Government's side. In the district court's earlier memorandum and order sustaining the Attorney General's claim of state secrets privilege, it was held that "disclosure ... would compromise valuable sources of foreign intelligence and have adverse consequences on the President's ability to conduct the nation's foreign affairs and to protect the nation's security." [145] We have inspected the in camera material and endorse Judge Flannery's appraisal of the consequences of disclosure. We find analogous an observation in a related proceeding in the Second Circuit:

> It seems to the [c]ourt that this may well be an attempt to checkmate the Government's legal quest for information by requiring the presence for interrogation of high level Government officials engaged in one of the Nation's most sensitive security areas. It confronts them with the choice of submitting to the questions of the defendant or, in the alternative, of abdicating its statutory rights.[146]

And, as we have already discussed, the district court's findings do not demonstrate that the material which defendant seeks is relevant, let alone necessary, to the defense.[147] It only confirms that the Attorney General is acting with considerations of the national defense, internal security, and foreign relations of the United States in mind—no improper motivation whatsoever. The Government, as we discussed earlier, has been cooperative in the suit thus far, and has an important and legitimate interest in maintaining this lawsuit.

■ There are, finally, alternatives available to defendant, which will afford the information which would be useful to it at a civil trial, while not impairing the Government's legitimate interests. The Second Circuit has suggested in its opinion *In Re Attorney General of the United States* [148] a procedure which the district court could easily have adopted. There, in overturning a contempt citation of the Attorney General for his refusal to deliver certain informant files to the opposing plaintiff's attorneys, the appellate court directed the trial court to make representative findings of fact from the files which would not compromise the information which the Attorney General asserted was privileged. A similar procedure would have been practical in this case, since due process would not require that the defendant gain actual physical possession of the documents. So long as the defendant is not deprived of the benefit of any of the evidence the documents might contain, in fact, it has lost nothing at all. In *Société Internationale* the Supreme Court noted the

---

*Cf. Westinghouse Elec. Corp. v. City of Burlington*, 351 F.2d 762, 769 (D.C.Cir.1965) ("There is no logical reason to set up two different privileges, one for civil and one for criminal cases. The defendant in a criminal case may have a greater stake than a party in a civil case, but that would not always be so .... The ... balance should be struck in each case, civil and criminal, in deciding whether disclosure 'is essential to a fair determination of a cause ....') (citing *Roviaro v. United States*, 353 U.S. 53, 61, 77 S.Ct. 623, 628, 1 L.Ed.2d 639 (1957)"). *See also* 4 J. MOORE, FEDERAL PRACTICE ¶ 26.61 [6.–4] at 26–317 (2d ed. 1981).

**145.** No. 76–1518, mem. op. at 4 (D.D.C. 13 July 1979), J.A. at 50.

**146.** *Attorney Gen. v. INAC*, 346 F.Supp. at 1389. *See also Loral Corp. v. McDonnell Douglas Corp.*, 558 F.2d 1130, 1133 (2d Cir. 1977) ("Courts of equity have the power and duty to adapt measures to accommodate the needs of the litigants with those of the nation, where possible").

**147.** *See, e.g., Spiegel, Inc. v. FTC*, 494 F.2d 59 (7th Cir.), *cert. denied*, 419 U.S. 896, 95 S.Ct. 175, 42 L.Ed.2d 140 (1974), where the Seventh Circuit upheld a hearing examiner's quashing of petitioner's subpoenas duces tecum since the court found that "the evidence sought was of no avail to Spiegel." *Id.* at 64. It was held there that even if the evidence demonstrated what petitioner said it would demonstrate, it was irrelevant, and that therefore the quashing of the subpoenas could not have been erroneous.

**148.** 596 F.2d 58 (2d Cir.), *cert. denied*, 444 U.S. 903, 100 S.Ct. 217, 62 L.Ed.2d 141 (1979).

availability of a similar remedy and the erroneous refusal of the district court to consider it.[149] The Attorney General himself could be required to make the necessary findings of fact. Finally, rather than put the Government in the dilemma of choosing either to drop its case or turn the state secrets over to defendant, the district court may properly itself delve more deeply than it might ordinarily into marshalling the evidence on both sides for the selective prosecution claim. This investigating is done routinely, for instance, by courts in deciding Freedom of Information Act requests. The district court may also consider other alternatives which the parties suggest.

It is possible, however, that the district court's evaluation of the circumstances will lead it to conclude that we have underestimated the defendant's stake or the necessity of the documents, or that the alternatives we have suggested are impractical, or that in some other way our weighing has been inequitable. If so, the district court should not hesitate to reweigh the factors it deems important and reevaluate the propriety of a dismissal. However, if our analysis above has correctly identified and described the relevant circumstances, we think a dismissal improper.

## IV. CONCLUSION

The district court erred in its conclusion that defendant is entitled to discovery for the selective prosecution claim. The evidence cited in the opinion does not demonstrate a colorable showing that the Attorney General was improperly motivated. Moreover, a ruling that defendant was entitled to discovery on the selective prosecution claim requires a colorable showing of selection as well as improper motive, and no such finding was made. On remand, the district court should reevaluate in light of today's opinion the evidence which defendant has presented for its selective prosecution defense. Finally we caution the dis-

trict court that, even if both elements of the selective prosecution claim are sufficiently present to warrant discovery, it does not follow that dismissal is the proper remedy if the material sought for discovery is a state secret. The factual circumstances surrounding the litigation must be borne in mind and a balancing of the interests of both parties must be undertaken.

*Reversed and remanded.*

BAZELON, Senior Circuit Judge, concurring:

I concur in all but Part II(A) of Judge Wilkey's opinion, and in its result. I also concur in Judge Wald's opinion. In addition, I should only like to add that I do not read Part III of Judge Wilkey's opinion to suggest that the government's "good faith" in cases such as this could ever be a dispositive or even particularly important factor in determining whether or not dismissal is warranted to preserve a defendant's right to due process. *Cf.* Wilkey op. at 950–951, 953–954. As Judge Wilkey's opinion points out, one of the ways in which refusing to disclose legitimately privileged documents differs from disobeying a production order is that the latter act—but not the former—implicates the "court's need to vindicate its authority." *Id.* at 950–952. The good faith of the nonproducing party is necessarily an important and appropriate factor that courts should consider in the usual Rule 37 proceeding determining sanctions for failure to obey a production order. *See Societe Internationale v. Rogers,* 357 U.S. 197, 212, 78 S.Ct. 1087, 1095, 2 L.Ed.2d 1255 (1958). Whether or not Rule 37 technically applies to the refusal to disclose legitimately privileged documents, however, the appropriate task for a court in *that* context is simply to "measure[ ] the relative weights of the parties' competing interests with a view toward accommodating those interests, if possible." *Wehling v. CBS,* 608 F.2d 1084, 1088 (5th Cir. 1979). The non-disclos-

---

**149.** 357 U.S. at 203, 78 S.Ct. at 1091. The Court in *Reynolds* similarly stressed the availa-

bility of alternatives to the disclosure sought. 345 U.S. at 11, 73 S.Ct. at 533.

**956**

ing party's good or bad faith may create objective facts that make "accommodation" more or less feasible. On the other hand, its "good faith" in and of itself should not be used to dilute the due process protection accorded to the party seeking disclosure.

Separate Opinion of Circuit Judge WALD, in which Senior Circuit Judge BAZELON concurs:

I concur in Judge Wilkey's opinion with the exception of Part II, A. I agree that a colorable claim of improper motivation has not yet been demonstrated but cannot entirely accept either his analysis of the legislative history or his comments on constitutionally permissible motivation.

■ As Judge Wilkey observes, *Diggs* requires that "a defendant alleging or invoking the selective prosecution defense, even at the discovery stage, must offer at least a colorable claim *both* that the prosecution was improperly motivated and that it was selective in the first place." Opinion of Wilkey, J., at 932. Here, neither prong of the *Diggs* standard was satisfied. First, the district court declined to rule on the issue of selection "because of the manifest difficulty of finding others 'similarly situated' in the sense of voicing strong and regular opposition to the foreign policy (regarding Ireland) of a major United States ally (Great Britain)." Mem. Op. at 3, J.A. at 114. And second, the court failed to identify adequate factual support for a colorable showing that the present action was prosecuted to "alleviat[e] *political* as well as financial and military support furnished [to] Irish militants by U. S. Citizens." Mem. Op. at 4, J.A. at 115 (emphasis in original). The district court's opinion points only to one witness' statement that "[p]erhaps" the Irish government made such a request. Deposition of Dennis Dickson at 52 (Jan. 30, 1980).

■ I cannot agree with Judge Wilkey, however, that FARA enforcement may permissibly be focused on one side (*i.e.*, the side

currently supported by the Administration) of foreign policy controversies that may be the subject of debate among Americans. Certainly the text of the Act and its legislative history allow the Justice Department to take account of foreign intelligence sources in deciding who is a foreign agent and how dangerous the agent may be and permit use of limited resources to target those alleged agents deemed most dangerous or powerful (*i.e.*, saboteurs, terrorists). But I resist the notion that the power of prosecution may be used selectively to manage the information put before the American people in debates over foreign policy. In this context, *i.e.*, selectively labelling a newspaper as an organ of propaganda for a foreign agent, issues of *constitutionally* improper motivation surface disturbingly. If the district court were to identify evidence which colorably shows that this newspaper was singled out for enforcement while those expressing views on the other side of the controversy were left alone and " 'the prosecution was undertaken with the motive to suppress' protected expression," Mem. Op. at 4, J.A. at 115 (quoting *United States v. Peskin*, 527 F.2d 71, 86 (7th Cir. 1975) (en banc)), the defendants would have made the requisite colorable showing of selective prosecution. FARA, evenhandedly applied, has survived constitutional objections, and in fact serves first amendment values by supplementing the information that might otherwise be available to the public. And I concede that, as Judge Wilkey's opinion points out, some unevenness was built into the Act through its congressionally authorized exemptions in the service of compelling interests of national security. But that unevenness may not permissibly be expanded through prosecutorial discretion to discredit views currently in disfavor while withholding the "spotlight of pitiless publicity" from views our government and allies prefer be presented to the American public in more palatable form.

Even were the district court to identify a colorable showing of both elements of a selective prosecution defense, however,

there is some question whether the documents at issue are, even under a "liberal" standard, "sufficiently related to that defense to justify compelling the government to release them." Mem. Op. at 5, J.A. at 116. Their relevance must, of course, be considered on remand in light of additional fact findings. But the district court's description suggests the documents record only communications upon which the Attorney General could permissibly base an exercise of prosecutorial discretion. The existence of such communications would seem to bear only tangentially on the claim that the Attorney General responded to pressure to suppress political support for Irish militants. Such attenuated relevance, even were it sufficient to justify a discovery order, at the very least lessens the value of the documents to the defense and suggests that their unavailability to the defense provides slender support for dismissal.